# FOR PUBLICATION

ATTORNEY FOR APPELLANT:

**DARREN BEDWELL**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**BRIAN REITZ**
Deputy Attorney General
Indianapolis, Indiana



FILED

Apr 23 2012, 9:32 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

RICHARD LEGGS,                        )
                                      )
    Appellant-Defendant,              )
                                      )
        vs.                       )        No. 49A02-1105-CR-522
                                      )
STATE OF INDIANA,                     )
                                      )
    Appellee-Plaintiff.               )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Lisa F. Borges, Judge
Cause No. 49G04-1002-FB-14436

**April 23, 2012**

**OPINION - FOR PUBLICATION**

**MAY, Judge**

Richard Leggs appeals his conviction of and sentence for two counts of Class B felony criminal confinement[1] and one count each of Class C felony intimidation,[2] Class C felony criminal recklessness,[3] and Class A misdemeanor resisting law enforcement.[4] He presents five issues for our review:

1.    Whether the charging information for the count of Class C felony intimidation was deficient;

2.    Whether the State presented sufficient evidence Leggs committed Class C felony intimidation;

3.    Whether the enhancement of three convictions based on Leggs' use of a single knife subjected him to double jeopardy; and

4.    Whether his two convictions of criminal confinement violated the "continuing crime" doctrine.

We affirm in part, reverse in part, and remand.

## FACTS AND PROCEDURAL HISTORY[5]

On February 24, 2010, Leggs and his wife, Kimberly, were home watching television when Leggs got up to go to the kitchen. On his way out of the room, he called Kimberly a "fat bitch." (Tr. at 47.) Leggs returned to the room, walked past the television, and asked

---

[1] Ind. Code § 35-42-3-3(b)(2).
[2] Ind. Code § 35-45-2-1(b)(2).
[3] Ind. Code § 35-42-2-2(c)(2).
[4] Ind. Code § 35-44-3-3.
[5] We held oral argument on this matter on March 9, 2012, at Indiana University – Northwest in Gary, Indiana. We thank the University for their hospitality, and commend counsel on their presentations.

Kimberly what she was looking at. Kimberly responded she was looking at the television, to which Leggs replied, "You're gonna die today. I hate you." (*Id*. at 48.)

Kimberly grabbed her purse and keys, and attempted to leave the residence, but Leggs took them from her. She then tried to use her cell phone to call for help, but Leggs took the cell phone. Leggs again said Kimberly was "gonna die," (*id*. at 49), and he pulled a kitchen knife from his pocket. Leggs pushed Kimberly on the bed and jumped on top of her. He held the knife over her head and made stabbing motions toward her nose, ear, and temple. Leggs told Kimberly, "I hate you. You don't love me like you used to[,]" (*id*. at 51), and then he stabbed her twice in the stomach.

Kimberly bit Leggs and was able to push him from atop her. She ran toward the door of the bedroom; Leggs followed her while making slashing motions with the knife, resulting in a cut on Kimberly's leg. Kimberly ran to the dining room, picked up a lamp, and struck Leggs with it. The couple struggled and ended up on the floor. The knife fell out of Leggs' hand, and he told Kimberly she was not "gonna leave there alive." (*Id*. at 53.)

At the time, Indianapolis Metropolitan Police Officers Scott Childers and Greg Crabtree were in the Leggs' apartment complex investigating a burglary in another unit. Officer Childers heard Kimberly crying and Leggs threatening her, and he knocked on the door of the Leggs' apartment. Kimberly attempted to answer the door, but Leggs pushed her back on the floor and held her there. Officer Childers heard Kimberly say, "let me out," and heard Leggs respond, "No, I'm not letting you out. I'm going to kill you." (*Id*. at 64.) Officer Childers knocked on the door again, and Leggs told Kimberly to open the door.

3

Kimberly opened the door and told Officer Childers, "I've been stabbed. Help me." (*Id.*) Leggs pushed Kimberly aside and attempted to run down the hall. Officer Childers grabbed Leggs, and a struggle ensued. Officers Childers and Crabtree eventually were able to subdue and handcuff Leggs. Kimberly was transported to the hospital, where she underwent surgery.

The State charged Leggs with two counts of Class B felony criminal confinement, two counts of Class C felony battery,[6] domestic battery as both a Class A misdemeanor[7] and Class D felony,[8] and one count each of Class C felony intimidation, Class C felony criminal recklessness, and Class A misdemeanor resisting law enforcement. For almost a year after he was charged, Leggs was incompetent to stand trial due to cognitive and speech difficulties resulting from a stroke in January 2010. On January 28, 2011, the trial court determined Leggs was competent to stand trial. The State amended the charging information on March 24 to include an allegation Leggs was an habitual offender.[9]

After a bench trial, the trial court entered convictions on all counts, but acquitted Leggs of the habitual offender enhancement. During the sentencing hearing on May 20, the trial court merged the two Class C felony battery counts and the Class D felony domestic battery count[10] into the second count of Class B felony criminal confinement. The State

---

[6] Ind. Code § 35-42-2-1(a)(3).
[7] Ind. Code § 35-42-2-1.3(a).
[8] Ind. Code § 35-42-2-1.3(b).
[9] Ind. Code § 35-50-2-8.
[10] The trial court already had merged the Class A misdemeanor domestic battery count into the Class D felony domestic battery count, which differed only by proof Leggs had previously been convicted of domestic battery. *See* Ind. Code § 35-42-2-1.3(b) (elevating the Class A misdemeanor to a Class D felony if the defendant had a prior conviction or committed the crime in front of a child under the age of sixteen).

4

requested the sentences for the two criminal confinement counts run consecutively, while Leggs argued the two counts were part of a continuing course of conduct. The trial court ordered the following four sentences served concurrently: fourteen years for Class B felony criminal confinement, five years for Class C felony intimidation, 545 days for Class D felony criminal recklessness, and 365 days for Class A misdemeanor resisting law enforcement. For the second count of Class B felony criminal confinement, the trial court sentenced Leggs to six years and ordered it served consecutive to his other sentences, for an aggregate sentence of twenty years.

## DISCUSSION AND DECISION

1.      Charging Information for Intimidation

In charging Leggs with Class C felony intimidation, the State alleged:

Richard Leggs, on or about February 24, 2010, did communicate to Kimberly Leggs, another person, a threat to commit a forcible felony, that is: that Richard Leggs would kill Kimberly Leggs, in retaliation for a prior lawful act, that is: attempting to leave the residence, and while making said threat did draw or use a deadly weapon, that is: pulled a knife from his waistband[.]

(App. at 28-29.) The elements of Class C felony intimidation as charged against Leggs are:

(a) A person who communicates a threat to another person, with the intent:
* * *
(2) that the other person be placed in fear of retaliation for a prior lawful act;
* * *
commits intimidation, a Class A misdemeanor.
(b) However, the offense is a
(1) Class D felony if:
* * *
(A) the threat is to commit a forcible felony;
* * *

5

(2) Class C felony if, while committing it, the person draws or uses a deadly weapon.

Ind. Code § 35-45-2-1.

Leggs argues the charging information for Class C felony intimidation does not allege that he acted with the intent to place Kimberly in fear. The State argues Leggs has waived this issue for review, because he did not move to dismiss the charge against him. As the State notes: "The proper method to challenge deficiencies in a charging information is to file a motion to dismiss the information, no later than twenty days before the omnibus date." *Miller v. State*, 634 N.E.2d 57, 60 (Ind. Ct. App. 1994) (citing Ind. Code § 35-34-1-4(b)(1)).

To avoid waiver, Leggs must demonstrate fundamental error. *See id*. ("Failure to timely challenge the omission ordinarily would result in waiver of the issues, unless the omission was so prejudicial to Miller's rights that fundamental error resulted.") (citations omitted). For error in a charging information to be fundamental, "it must mislead the defendant or fail to give him notice of the charges against him so that he is unable to prepare a defense to the accusation." *Id*. at 61. Leggs did not argue he did not understand the charges against him or he was unable to formulate a defense. *See Wine v. State*, 637 N.E.2d 1369, 1374 (Ind. Ct. App. 1994) (no fundamental error where Wine did not demonstrate his defense was impeded by the inadequacy of the charging information), *trans. denied*. Thus, Leggs has not demonstrated fundamental error.

6

## 2. Sufficiency of Evidence – Intimidation

When reviewing sufficiency of evidence to support a conviction, we consider only the probative evidence and reasonable inferences supporting the trial court's decision. *Drane v. State*, 867 N.E.2d 144, 146 (Ind. 2007). It is the fact-finder's role, and not ours, to assess witness credibility and weigh the evidence to determine whether it is sufficient to support a conviction. *Id.* To preserve this structure, when we are confronted with conflicting evidence, we consider it most favorably to the trial court's ruling. *Id.* We affirm a conviction unless no reasonable fact-finder could find the elements of the crime proven beyond a reasonable doubt. *Id.* It is therefore not necessary that the evidence overcome every reasonable hypothesis of innocence; rather, the evidence is sufficient if an inference reasonably may be drawn from it to support the trial court's decision. *Id.* at 147.

Leggs argues the State did not prove he had "specific intent to place [Kimberly] in fear for trying to leave the residence," (Br. of Appellant at 13), and Kimberly's attempt to leave was not a prior lawful act as required by Ind. Code § 35-45-2-1. In support of his argument, Leggs relies on *Casey v. State*, in which we discussed the intent element of intimidation:

> [I]t is apparent that the legislature intended to require the State to prove that the victim had engaged in a prior act, which was not contrary to law, and that the defendant intended to repay the victim for the prior lawful act. . . . [T]he State must establish that the legal act occurred prior to the threat and that the defendant intended to place the victim in fear of retaliation for that act.

676 N.E.2d 1069, 1072 (Ind. Ct. App. 1997). Leggs asserts Kimberly's attempt to leave the

apartment was not a "prior lawful act" because it did not occur before he threatened to kill her. We disagree.

The State presented evidence Leggs told Kimberly she was "gonna die tonight," (Tr. at 48), and then began stabbing in her direction. He then said, "You don't love me like you used to." (*Id*. at 51.) The State argues Leggs' actions were retaliation for his perception of Kimberly's feelings towards him, which was a lawful act. As this was a bench trial, we presume the judge knows and will follow the applicable law. *Donaldson v. State*, 904 N.E.2d 294, 300 (Ind. Ct. App. 2009). The State's argument reflects a reasonable inference to be drawn from the evidence presented, and we hold the evidence was sufficient to convict Leggs of intimidation.

3.    Enhancement for Use of Knife in the Commission of the Crimes

A defendant is subjected to double jeopardy "where a felony is elevated in class based on the same statutory factor and factual basis that was used to elevate another felony in class, [thus] the two cannot stand together and one must be reduced in class." *Pierce v. State*, 761 N.E.2d 826, 830 (Ind. 2002). Three of Leggs' crimes, two counts of intimidation and one count of criminal confinement, were enhanced because he used a knife while committing each crime. Leggs argues use of the same evidence to enhance all three crimes  subjected him to double jeopardy.

In *Hancock v. State*, 768 N.E.2d 880, 880 (Ind. 2002), the trial court convicted Hancock of Class A felony rape and Class A felony criminal deviate conduct. Both crimes were enhanced because Hancock drugged the victim without the victim's knowledge.

8

Hancock was subjected to double jeopardy because evidence Hancock drugged the victim was used to enhance both crimes. *Id.* at 880. Likewise, in *Pierce*, our Indiana Supreme Court held the same bodily injury to the victim could not be used to enhance both the burglary and the robbery charges against Pierce. *Pierce*, 761 N.E.2d at 830.

The State asserts, citing *Miller v. State*, 790 N.E.2d 437, 439 (Ind. 2003), "[t]he use of a 'single deadly weapon' during the commission of separate offenses may enhance the level of each offense.'" (Br. of Appellee at 16.) The *Miller* Court reasoned the repeated use of the same weapon to commit multiple crimes was not the "very same behavior" that would implicate double jeopardy. *Miller*, 790 N.E.2d at 439. In his concurring opinion, Justice Sullivan noted: "What justifies the multiple enhancements here is the *repeated* use of the knife by the defendant in committing crimes for which he was convicted." *Id.* (Sullivan, J., concurring) (emphasis in original).

The facts of *Hancock* and *Pierce* are distinguishable from those in the instant case because our holdings were based on single instances of conduct - in *Hancock*, a single drugging the victim, and in *Pierce*, one instance of bodily injury. In contrast, Leggs used his knife first to stab at Kimberly's face, then to stab her in the stomach, then to slash at her leg, and finally to hold her to the ground in their living room. We agree with the State's assertion that Leggs "made a decision to involve his knife in each of his crimes . . . [thus] each crime may be elevated based on the use of the same knife." (Br. of Appellee at 17.) Leggs was not subjected to double jeopardy when he was convicted of multiple crimes enhanced by the use

of a knife. *See*, *e.g.*, *Miller*, 790 N.E.2d at 439 (repeated use of knife justified multiple enhancements to crimes committed).

### 4. Criminal Confinement Convictions

The continuing crime doctrine applies when actions "sufficient in themselves to constitute separate criminal offenses may be so compressed in terms of time, place, singleness of purpose, and continuity of action as to constitute a single transaction." *Firestone v. State*, 838 N.E.2d 468, 471 (Ind. Ct. App. 2005). In such circumstances, the State may convict the defendant of only one crime. *Id*. at 472.

In *Boyd v. State*, 766 N.E.2d 396, 400 (Ind. Ct. App. 2002), we held: "[a] confinement ends when the victim feels, and is, in fact, free from detention and a separate confinement begins if and when detention of the victim is re-established." Leggs contends, "from the time Leggs took away [Kimberly]'s purse and keys until the time he told her to open the door, there was no point at which she was 'free from detention' and free to leave the apartment." (Br. of Appellant at 9.)

The State argues there were two separate instances of confinement. First, the State asserts, Kimberly was confined to the bedroom, and Leggs stabbed her there. She was able to leave the bedroom after biting Leggs, and the State contends the first instance of confinement ended at that time. The second confinement, the State asserts, began when Leggs prevented Kimberly from answering the door and indicated she would not leave the apartment alive. It ended when Leggs allowed Kimberly to open the door for the police. We disagree.

10

At trial, Kimberly testified after Leggs told her, "You're gonna die today. I hate you[,]" he took her purse, keys, and cell phone from her. (Tr. at 48.) Leggs then pulled a knife out of his pocket and "pushed [Kimberly] – jumped on top of [her] and pushed [her] back on the bed and just had the knife over [her] head." (*Id*. at 50.) Kimberly testified Leggs began "doing weird stuff" with the knife, such as "pretending like he was going to stick it up [her] nose, and then in [her] ear, and then at [her] temple." (*Id*.) Leggs then stabbed Kimberly twice while they struggled on the bed, and she bit him.

After she bit him, Kimberly got up off the bed and pushed Leggs. She testified she was "running towards my bedroom door and he had the knife just kind of slashing it; caught me on the back of the leg a little bit and I ran down the hallway in my house into my dining room, there's a little lamp and I hit him with the lamp." (*Id*. at 51-52.) The State then asked Kimberly, when presenting a picture of the lamp for admission into evidence, "that's the lamp you hit him with as you were trying to escape the apartment?" (*Id*. at 52-53.) Kimberly answered affirmatively, and then testified, "when I hit him with the lamp and we were kind of still struggling and I was still running – I wasn't all the way – I wasn't to my door, I was started (sic) trying to get to my door. I tried to get to the door." (*Id*. at 53.)

Leggs then "pushed [Kimberly] back on the floor" and held her down. (*Id*. at 54.) While Leggs held Kimberly on the floor, the police knocked on the door. Kimberly asked who it was and testified she did not hear the response. After the response, Leggs "looked at [Kimberly] and he looked at the knife and he took and threw the knife and then he told [her] to open the door." (*Id*. at 54-55.) Kimberly ran to the door, opened it, and told the police

11

Leggs was trying to kill her. The police pursued and arrested Leggs, and called an ambulance for Kimberly.

Based on Kimberly's testimony, there was never a time during the incident when she felt free to leave. The evidence does permit the inference the State invites us to draw that Kimberly felt unconfined when she was able to get up off the bed. However, she answered affirmatively when asked if she hit Leggs with a lamp after leaving the bedroom, while she was "trying to escape[.]" (*Id*. at 53.) Kimberly testified she was "trying to get to the door" while Leggs was chasing her through the apartment. (*Id*.) Leggs told Kimberly she was not going to leave the apartment alive and Leggs was going to kill her.

Kimberly's testimony established the continuing nature of the crime, which took place over a short period of time, in the same apartment, with a single purpose – that Kimberly not leave the apartment alive. Kimberly did not feel free from confinement until she opened the door to the apartment; she testified she was trying to escape after leaving the bedroom, and her goal in escaping was to reach the apartment door. Therefore, Leggs' two convictions of Class D criminal confinement violate the continuing crime doctrine, and one must be reversed. We remand for reversal of one of Leggs' criminal confinement charges and resentencing.[11]

---

[11] Leggs argues his sentence was inappropriate based on the nature of his crime and his character. As we remand for resentencing, we do not address that allegation of error.

# CONCLUSION

Leggs waived his argument regarding the deficiencies in the charging information for Class C felony intimidation because he did not file a motion to dismiss the charges at the trial court level. Waiver notwithstanding, Leggs did not demonstrate the deficiencies in his charging information rose to the level of fundamental error. There was sufficient evidence Leggs committed Class C felony intimidation, and Leggs was not subjected to double jeopardy when his convictions for several crimes were enhanced by his repeated use of a knife.

However, Leggs' two convictions of Class B felony criminal confinement violate the continuing crime doctrine. Accordingly, we reverse one of his criminal confinement convictions and remand for resentencing.

Affirmed in part, reversed in part, and remanded.

MATHIAS, J., and BRADFORD, J., concur.